ROBERT G. SHEETS and SAMUEL S. DAY, Respondents, v. THE IOWA STATE INSURANCE COMPANY, Appellant.

Kansas City Court of Appeals, February 13, 1911.

1. **APPELLATE PRACTICE: Instructions: Necessity of Objections.** Where the defendant failed to object at the trial to any of the instructions given at the request of the plaintiff, the rule "that before one can legally except to the action of the court in giving or refusing instructions, he must first request the court to give the same or object thereto, as the case may be, before his exceptions will be availing," applies not only to instructions involving constitutional questions, but is applicable to all given instructions. Hence, assignments of error by defendant relating to such instructions of plaintiff, are not before the appellate court.

2. **FIRE INSURANCE:** **Agency:** **General Distinguished from Special Agent.** In the agency contract, defendant fire insurance company curtailed the authority of its agent to that of a mere solicitor of insurance who was only to be intrusted with the receipt of applications for insurance, and premiums therefor. The policy, on its face, however, contemplated that a sale of the property might be made while the insurance was in force. There were no provisions in the policy that the endorsement of the company must be made by any particular officer. In addition to taking the applications for policies, and collecting premiums, the agent countersigned all policies issued through his office and delivered them. *Held,* that the agency of defendant's solicitor was general rather than special in view of the provisions of section 7995, R. S. 1899 (section 7047, R. S. 1909) that "foreign companies admitted to do business in this state shall make contracts of insurance only by lawfully constituted and resident agents, who shall countersign all policies so issued."

3. ———: **Statutes:** **Construction of Section 7047, R. S. 1909.** One of the main purposes of section 7795, R. S. 1899 (section 7047, R. S. 1909) was to put a stop to the irritating and unjust practice indulged in by some insurers of adroitly phrasing their agency contracts in a way to bestow general powers upon their agents when such powers relate to the benefits flowing to the company, and to invest such agents with no power to represent the company when the benefits of the insured are involved.

4. ———: ———: ———: Under the provisions of section 7995, R. S. 1899, (section 7047, R. S. 1909) countersigning resident agents of foreign fire insurance companies are presumed to possess authority to make contracts of insurance for the principals, and defendant is estopped from disputing such authority.

5. ———: **Increase of Insurance:** **No Forfeiture.** Where additional fire insurance was taken out with the knowledge and consent of the local agent of the defendant, a foreign insurance company, and such additional insurance did not increase the total insurance beyond the limit fixed by the "rider" attached to the policy, the proposition that the increase of the insurance was in direct violation of the contract, and that the forfeiture of the policy was the penalty imposed, must be ruled against defendant.

6. ———: **Alienation Clause:** **Sale in Course of Business.** A sale in bulk of goods worth $400 out of a stock valued at $9000 was a sale made in the course of business from stocks of merchandise to which the alienation clause of a fire insurance policy was not intended to apply, because such a sale would not materially enhance the risk.

Appeal from Grundy Circuit Court.—*Hon. P. C. Stepp,* Judge.

AFFIRMED.

*Hall & Hall, James C. Davis* and *Hughes & Sawyer* for appellant.

*A. G. Knight, E. R. Sheetz* and *E. M. Harber* for respondents.

JOHNSON, J.—This is an action on a policy of fire insurance. The trial resulted in a judgment for plaintiff for the full amount of the policy with interest and costs and an appeal to this court was allowed defendant. We transferred the cause to the Supreme Court on the ground that a constitutional question was in the case but that court held that the question "was not timely raised below and for that reason cannot be properly considered on appeal" and sent the case back. [Sheets v. Insurance Co.. 226 Mo. 613.]

Counsel for defendant have sixteen specifications of error in their brief, thirteen of which refer to instructions given by the court at the request of plaintiffs. One of these instructions, numbered 3, was attacked in the motion for a new trial on the ground that the statute on which it was based (section 7995, R. S. 1899) is unconstitutional. That was the constitutional question which prompted us to transfer the cause to the Supreme Court and which that court held was not raised in proper time since first it appeared in the motion for a new trial. The rule was iterated in the opinion that "in so grave a matter as a constitutional question it should be lodged in the case at the earliest moment that good pleading and orderly procedure will admit under the circumstances of the given case, otherwise it will be waived," and it was held that defendant

should have raised the question at the time the instruction founded on the statute was offered. The fact is noted that the record fails to show any objection to the instruction and the rule is pronounced "that before one can legally except to the action of the court in giving or refusing instructions, he must first request the court to give same or object thereto, as the case may be, before his exceptions will be availing."

In Welch v. Coal Co., 132 S. W. Rep. 49, we held this rule applicable to all given instructions and rejected the view that it was intended to apply only to instructions involving constitutional questions. Such also is the conclusion of the St. Louis Court of Appeals. [Stevens v. Maccabees, 132 S. W. 757.] We perceive no reason for changing our opinion and, since the record before us does not show that defendant objected to any of the instructions given at the request of plaintiff, we hold that the assignments of error relating to such instructions are not before us and shall confine our attention to the remaining assignments discussed in the briefs. Two of them are based on the refusal of the court to give the jury a peremptory instruction to find for defendant and the other relates to rulings on evidence.

The material facts of the case thus may be stated: Defendant is a foreign insurance company and has its chief office in Keokuk, Iowa. It is licensed to do business in this state and maintains an agency at Cainsville, Missouri. In September, 1904, it issued a policy for $2000 to Adams & Son of Cainsville on a stock of merchandise owned by that firm. The agent of defendant at Cainsville—J. W. Henderson—attended to the business of taking the application for the insurance, forwarding it to the head office, delivering the policy to the assured, collecting the premium and remitting it to the head office. He also countersigned the policy and in doing all these things followed the usual course of business he had pursued for a number of years with

the consent of defendant. Among the stipulations of the policy were the following:

"No officer, agent or employee of this company shall have power or authority to waive any of the terms or conditions of this policy, either before or after loss, except only the secretary of this company, and any waiver by him must be in writing signed by him and endorsed upon, or attached to the policy. This entire policy shall be void, unless otherwise provided by written agreement, endorsed hereon or added hereto, in any of the following cases, to-wit: If at the time of loss the title or interest of the assured, in the property described in this policy, or any part thereof be less than an unqualified ownership, free and clear of all liens, equities or incumbrances. . . . If any other insurance whether valid or not exists or is placed on the property insured, or any part thereof. . . . In case there shall be any other policies or contracts of insurance on the property herein insured, with the consent of this company, as herein provided (the insured) shall recover of this company only such proportion of the loss upon any item as the sum hereby insured thereon shall bear to the whole amount of insurance thereon, whether specific or blanketed with other items, and if any such policies contain any limitations or exemptions such limitations or exemptions shall limit the proportion of the liability of this company. . . . All papers or riders attached to this policy bearing same number, and signed by the secretary of the company shall be and form a part of this policy."

On the back of the policy was the form of an assignment for use in case of the sale of the property and at the bottom of the form were the words: "The company hereby consents to the above assignment, subject to all the terms and conditions of the policy, and the questions and answers in the application."

Attached to the policy was the following "rider:" "The Legislature of the State of Missouri having by

enactment provided that no company shall take a risk on any property in said state at a ratio greater than three-fourths of the value of the property insured, it is a condition of this policy that the total insurance of the described property shall be limited to three-fourths of the cash value of such property or any item thereof, and that this company shall not be liable in case of loss or damage by fire for an amount greater than three-fourths of the actual cash value of each item of property insured by this policy (not exceeding the amount insured on each such item) at the time immediately preceding the fire, nor for more than this company's proportion of three-fourths of such cash value of each item insured, in case of other insurance thereon; and if the amount of this policy on any item therein, together with all other insurance thereon (if any other insurance is permitted in writing on the policy) exceeds three-fourths of the cash value of such property or any item thereof, it shall thereby become void to the extent of such excess; and if by reason of this clause the liability of this company shall be less than the amount of insurance thereon for which premium has been paid, this company will on demand, refund to the assured for the full term of the policy the premium received by it on the difference between the amount insured and the amount paid for total loss on such property."

Before applying for this policy Adams & Sons had procured another policy of $2000 from another insurance agent in Cainsville, a Mr. Woodward. Henderson and defendant had knowledge of the existence of this insurance and issued the policy in question knowing that it would increase the total insurance on the stock to $4000. On October 18, 1904, Adams & Son traded the stock to plaintiffs for some real estate. The "trading value" of the stock was placed at $9000, and there is substantial evidence tending to show that its actual

market value exceeded that sum. If we were sitting as triers of fact we would say the actual value was not over $6000, but in our consideration of the demurrer to the evidence we must accept as proved the facts most favorable to plaintiffs which we find supported by substantial evidence and, from this viewpoint, we give full credence to the testimony of plaintiff Sheets, who testified:

"Q. You say the stock was worth about nine thousand dollars at the time it was transferred to you? A. Yes, sir, I invoiced it after I traded it. It invoiced nine thousand three hundred dollars."

"Q. At what value did you invoice it? A. I tried to invoice it at what it was worth on the market."

The property included a stock of groceries and grocery fixtures valued at about $400. On either the day of the purchase of the stock or the next day, plaintiff Sheets and the senior Adams took the two policies and visited the offices of Mr. Woodward and Mr. Henderson for the purpose of having the policies assigned to plaintiffs. After successfully concluding this business with Mr. Woodward, Sheets applied for and obtained an additional policy for $1000 on the goods and then he and Adams proceeded to the office of Henderson. The nature of the business they transacted with him is a subject of serious controversy. It is the contention of defendant that Henderson was a soliciting, not a resident agent and that he had no authority to execute an assignment as defendant's representative. Henderson states he had no such authority and that to expedite the transfer he cut out a form of assignment from a blank policy, filled it out, had it signed by Adams and Sheets and sent it to the head office for approval and execution by defendant. This statement of what occurred is contradicted by Sheets who states that nothing was said about any restrictions on the authority of the agent and that as soon as he learned what was wanted he filled the blank on the back of the policy, signed it as defendant's agent

and delivered it to Sheets who took it back to the store and put it in the safe where it was destroyed in the fire. For the purposes of the demurrer to the evidence we adopt the testimony of Sheets as the true version of the transaction. On this visit Sheets applied to Henderson for an additional policy of $1000, and the next day Henderson delivered him a policy for that amount issued by another company. So according to the evidence of plaintiffs the net result of the visits to the insurance agents was the transfer to plaintiffs of the existing policies and the increase of the insurance on the stock from $4000 to $6000. As to the object of plaintiffs in increasing the insurance, Sheets testified:

"At that time I intended to continue the business at Cainsville and increase my stock, to put in a ten thousand dollar stock. And after I decided not to increase the stock I cancelled this policy (the new policy) with Mr. Henderson. I never paid him anything on it at all, never paid the premium."

Henderson testified: "I wrote him then the policy in the St. Louis company for one thousand dollars and delivered it to Sheets the next day about nine o'clock. I took it up from Sheets some time later. The policy was in force about twenty-five days. It had earned $3.50. Mr. Sheets paid me the short rates on the policy when I took it up. The premium was $17 and the policy was to run for one year."

The policy of $1000 procured from Woodward was cancelled by the insurer in November or early in December. The old policy of $2000 issued to Adams & Son through Woodward's office was cancelled by the insurer December 10, 1904. After this there remained no other insurance on the stock but the policy in controversy.

The fire occurred the day after the cancellation by Woodward of the $2000 policy and resulted in the total destruction of the stock. In November preceding the fire plaintiff sold the stock of groceries in bulk for $400,

its reasonable value, but did not notify defendant of the sale. The argument of defendant that the policy was not in force at the time of the fire may be reduced to three main propositions, viz., first: The assignment of the policy from Adams & Son to plaintiffs was not consummated in accordance with the provisions of the contract and, therefore, was ineffective though Henderson, in fact, attempted to assume authority to act as the vice-principal of defendant in its execution. Second: The increase in the insurance was in direct violation of the contract and the forfeiture of the policy was the penalty imposed therefor by the contract. Third: The sale in bulk of a part of the stock without the consent of the insurer incurred a forfeiture of the policy. We shall dispose of these propositions in the order of their statement.

I. This proposition is predicated on the contention that Henderson was a special agent of limited powers authorized only to solicit insurance. One of defendant's general officers testified:

"The Iowa State Insurance Company has two classes of agents in Missouri, recording and soliciting. The character of business done by soliciting agents is to take applications and send them in to the company. Soliciting agents have no authority to consent to the transfer of policies. They have no authority to modify or change any of the terms of the policy. The soliciting agent takes the applications, sends them to the company, and, if accepted, the company writes the policy, sends it to the agent, and the policy is delivered by the agent to the assured. Henderson belongs to the soliciting class of agents. He had no authority to issue policies and never issued policies."

With this statement of the character of Henderson's agency as a text counsel for defendant rely on the well settled rule often recognized in this state "that a mere soliciting agent of an insurance company intrusted

with the receipt of applications for insurance and premiums therefor cannot, without more, bind the company by his oral contract for present insurance pending the action of the company on the applications forwarded by him as agent." [Embree v. Insurance Co., 62 Mo. App. 132.]

In Trask v. Ins. Co., 58 Mo. App. 431, a case much relied on by defendant, it was held by the St. Louis Court of Appeals that where the agency contract disclosed that the agent was authorized "only to receive and forward to this company applications for insurance and to collect and transmit premiums therefor" and reserved to the company the right to accept or reject any and all such applications and the evidence failed to show "a holding out of said special agent by defendant as having any greater authority than that conferred upon him by the terms of the special agency under which he was employed," the agent had no authority to make a contract of insurance binding upon his principal.

We concede the soundness of this doctrine and, further, we shall concede that in the agency contract defendant did curtail the authority of its agent to that of a mere solicitor of insurance. It remains to be seen whether or not defendant held its agent out to the world as one possessed of general powers including that of *making* contracts of insurance on its behalf. The policy on its face contemplates that a sale of the property may be made while the insurance is in force and makes provision for the assignment of the policy with the consent of the company. There is no provision that the indorsement of the company to the assignment must be made by any particular officer or that the policy must be sent to the home office for such purpose. It is stipulated that the policy shall be void when the property is alienated or incumbered without the consent of the company and that the secretary of the company is the only officer or agent possessing authority to waive any of the terms and conditions of the policy. But such stipula-

tions constitute no limitation on the power of general agents to make contracts of insurance and as "a renewal of a policy is, in effect, a new contract of assurance" (Jenkins v. Ins. Co., 171 Mo. 383), so the assignment of a policy with the written consent of the insured in legal effect is the making of a new contract and an agent clothed with authority to make contracts of insurance is clothed with authority to indorse his principal's consent to the assignment of a policy. We quote approvingly from the opinion of the Supreme Court of Nebraska in Insurance Co. v. Rounds, 53 N. W. Rep. 660:

"It is urged that the indorsement was not binding until approved by the company, and that it, immediately after receiving notice thereof rejected it, and ordered the policy cancelled. There is no provision of the policy which requires that such indorsement should be made by any particular officer of the company, or that the policy must be sent to the home office of the company for such purpose. It only specifies that the policy shall be void where the property insured is alienated or incumbered, unless the consent of the company is indorsed on the policy. A local agent having the power to make a contract of insurance has authority to make indorsements upon a policy of insurance like the one in question, and, when so made, the company will be bound thereby."

Indeed, the officer of defendant, from whose testimony we quoted, admits the authority of general agents of defendant to "grant assignments" without sending the policies in to the home office. He testified:

"Q. The only difference between your recording agents and your soliciting agents is, in one of them the policy is filled out at the office and sent to the soliciting agent for his countersigning and delivery, and the other keeps the policies on hand and issues them? A. No, sir.

"Q. Isn't there that difference? A. Yes, sir.

"Q. What else is there? A. *The recording agent has the power to make endorsements, grant assignments.*

"Q. The recording agents fill in these blanks? A. Yes, sir.

"Q. And the policies are signed by the officers and placed in his charge? A. Yes, sir.

"Q. Then he countersigns and delivers them? A. Yes, sir.

"Q. And the other way, it is filled out by the company at the home office, signed by the president and secretary, then sent to the soliciting agent for his countersigning and delivery? A. Yes, sir."

If Henderson was held out by defendant as a general agent authorized to make contracts of insurance it is bound by his acts performed within the scope of his apparent authority, among them, the act of indorsing defendant's consent to the assignment in question. In addition to taking the application for policies and collecting premiums, Henderson *countersigned* all policies issued through his office and delivered them. We are not holding that this practice, in the absence of the statute to which we shall presently refer, would characterize the agency as general instead of special. We express no opinion on that point since we find the characterization is made by the statute which defendant sought to have declared unconstitutional. That statute provides:

"Foreign companies admitted to do business in this state shall make contracts of insurance upon property or interests therein only by lawfully constituted and resident agents, who shall countersign all policies so issued. And any such insurance company who shall violate any provision of this section shall suffer a revocation of its authority by the superintendent of insurance to do business in this state, in addition to the penalty prescribed in section 8002, such revocation to be for the term of one year."

This is the first occasion this statute, which was enacted in 1897, has been before a court of last resort for interpretation. The meaning of the statute is clear and one does not have to go far to ascertain the legislative intent that prompted its enactment. Obviously one of its main purposes was to put a stop to the irritating and unjust practice indulged in by some insurers of adroitly phrasing their agency contracts in a way to bestow general powers on their agents, who come in direct contact with the public, when such powers relate to benefits flowing to the company, and to invest such agents with no power to represent the company when the benefits of the insured are involved. Such attempted aggressions frequently have been repelled by the courts of this state under the doctrine that "an insurance company cannot make its local agent the medium through which all the benefits of a policy flow from the insured to it and then deny that he has authority to represent it when the benefits of the insured are involved." [Nickell v. Ins. Co., 144 Mo. 420.]

And the Legislature evidently thought further to discourage them by requiring all contracts of insurance to be made by regularly constituted and lawfully licensed resident agents who shall countersign the policies so that when the insured received his policy he would know that the local agent who countersigned it possessed the power to make contracts for his company and to bind it as a general or as defendant calls it a recording agent. When plaintiffs saw the name of Henderson countersigned on the policy they were justified in assuming he had authority to consent to the assignment and we hold that defendant is estopped by the provisions of the statute from disputing such authority. The contention that he was only a soliciting agent necessarily is an assertion that defendant made a contract of insurance in this state in violation of the law, since, in such case it would have made the contract of insurance without the intervention of a resident agent duly

authorized to make such contracts. Defendant will not be suffered to stand on such immoral ground and we shall assume for the purposes of this case that the countersigning of the policy was in compliance with the statute. We are not saying that a foreign insurance company may not employ soliciting agents of limited powers in this state, but we are holding that countersigning resident agents are presumed to possess authority to make contracts of insurance for their principals.

II. The additional insurance was taken out with the knowledge and consent of Henderson, the local agent, and, according to evidence of plaintiffs, did not increase the total insurance beyond the limit fixed by the "rider" attached to the policy. The second proposition must be ruled against defendant under the rule applied in Bush v. Ins. Co., 85 Mo. App. 155, where speaking through ELLISON, J., we said: "There was a three-fourths value clause attached to the policy as a 'rider' in the following words. 'Three-Fourth Value Clause. It is a part of the consideration of this policy, and the basis upon which the rate of premium is fixed, that in the event of loss, this company shall not be liable for a greater amount than three-fourths of the actual cash value of the property covered by this policy at the time of such loss, and, in case of other insurance, whether policies are concurrent or not, then for only its pro rata proportion of such three-fourths value. Total insurance permitted is hereby limited to three-fourths of the actual cash value of the property hereby conveyed and to be concurrent herewith.' "

We had occasion to consider a clause of like character to this, though expressed in broader language, in Dodan v. Ins. Co., decided at this term, and we there held the clause to be a permit for other insurance up to the three-fourths limit; the clause in this "rider" reading: "Total insurance permitted is hereby limited to three-fourths of the actual cash value of the

property hereby covered and to be concurrent herewith," meaning that permission is thereby granted the assured to procure that amount of insurance. [Palatine Ins. Co. v. Ewing, 92 Fed. Rep. 111; Ins. Co. v. Bussell, 48 S. W. Rep. (Tenn.) 703.]"

III. We think the alienation clause in the policy was not intended to apply to sales made in the course of business from stocks of merchandise. The rule thus is stated in 2 Cooley's Briefs on the Law of Insurance, 1746: "An insurance on a stock of goods which in the nature of business will be continually changed, is an insurance on the stock, and not on the specific goods in stock at the time the policy issued, so that sale from the stock and removal thereof will not forfeit the policy though it contains a non-alienation clause."

A sale in bulk of the entire stock, or of enough thereof to materially affect the risk would constitute a breach of the alienation clause but a sale in bulk of goods worth $400, out of a stock valued at $9000, cannot be considered as an enhancement of the risk, especially where the value of the stock remaining still exceeds by more than 33 1-3 per cent the amount of the outstanding insurance. A sale of this character should be treated as one made in the ordinary course of a merchant's business.

We have examined the objections to the rulings on the evidence and find that no prejudicial error was committed against defendant in these rulings. The judgment is affirmed. All concur.